1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
2                          MARSHALL DIVISION

3


4
     JUXTACOMM TECHNOLOGIES, INC. )
5                                 )     DOCKET NO. 2:07cv359
                                  )
6        -vs-                     )
                                  )     Tyler, Texas
7    ASCENTIAL SOFTWARE CORP.,    )     1:30 p.m.
     ET AL                        )     February 4, 2009
8


9


10
                     TRANSCRIPT OF MARKMAN HEARING
11              BEFORE THE HONORABLE LEONARD DAVIS,
                   UNITED STATES DISTRICT JUDGE
12


13


14
                      A P P E A R A N C E S
15
        SEE ATTORNEY SIGN-IN SHEETS ATTACHED AT DOCKET ENTRY 435
16


17


18


19


20   COURT REPORTER:        MS. SHEA SLOAN
                            211 West Ferguson
21                          Tyler, Texas  75702
                            903/590-1176
22


23
     Proceedings taken by Machine Stenotype; transcript was
24   produced by a Computer.

25

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              All right.  Ms. Ferguson, if you will call the case,

4    please.

5              THE CLERK:  Case No. 2:07cv359, JuxtaComm v.

6    Ascential.

7              THE COURT:  Announcements.

8              MR. MACON:  Good afternoon, Your Honor.  My name is

9    Larry Macon.  Together with Johnny Ward, Kirt O'Neill, Holly

10   Dekam, Mike Kiklis and Scott Rhoades, we represent the

11   plaintiff JuxtaComm.

12             THE COURT:  Very good.

13             MR. ALBRITTON:  Hi, Your Honor.  Eric Albritton.

14   With me is Marc Pensabene, John Desmarais, and Bob Appleby;

15   and we represent Ascential Software, Cognos, DataMirror, and

16   IBM. We are ready.

17             THE COURT:  Thank you, Mr. Albritton.

18             Next.

19             MR. MALONEY:  Collin Maloney and my co-Counsel Julie

20   Petruzzelli.  We are here for MetaStorm, and we are ready to

21   go.

22             THE COURT:  Thank you, Mr. Maloney.

23             Next.

24             MR. FINDLAY:  Good afternoon, Your Honor.  Eric

25   Findlay and Kelly Hunsaker here for Microsoft.  Also with us

1    is Rob Lytle.

2            THE COURT:  Thank you.

3            MR. BUNT:  Chris Bunt here on behalf of Business

4    Objects.  With me today is Shamita Etienne-Cummings and Ms.

5    Jennifer Gossain.

6            THE COURT:  Mr. Bunt.

7            MR. ERSKIN:  Good afternoon, Your Honor.  Blake

8    Erskin and Ryan Tyz for Informatica.

9            THE COURT:  Thank you, Mr. Erskin.

10           MR. HARRISON:  Your Honor, Guy Harrison for Software

11   AG and WebMethods.

12           THE COURT:  Thank you, Mr. Harrison.

13           MS. ABERNATHY:  Claire Abernathy on behalf of Open

14   Text.

15           MR. JONES:  Thank you, Your Honor.  Mike Jones and

16   Mark Evans for Sybase.

17           THE COURT:  Okay.  Thank you.

18           Anyone else?  All right.  Pretty good group today.

19   All right.  Let's get started.  I think I would like to start

20   with just a brief opening statement by each side, not more

21   than three or four minutes, just whatever opening comments --

22   I have, of course, reviewed the tutorials and the patent and

23   the briefs and all of that information.  I don't need an

24   opening in that sense.  But just anything that you think would

25   be important to me that I need to focus in on today and how

1    you would perceive would be the best way for us to proceed.

2          MR. O'NEILL:  Your Honor, Kirt O'Neill for the

3    plaintiff.  We did reach agreement on some other terms last

4    night.

5          THE COURT:  Wonderful.

6          MR. O'NEILL:  I believe we sent Mr. McLemore the new

7    claim chart by email last night, but I also had printed

8    versions for the Court and for Mr. McLemore.  I also have it

9    on disk in WordPerfect form if you would like.  The printed

10   copy may suffice.

11         THE COURT:  All right.

12         MR. O'NEILL:  The additional terms that we have

13   reached agreement on last night were "metadata database" and

14   "data bag."  And we also reached an agreement concerning the

15   use of the word "component" in construction of two of the

16   claim terms; that being a "rule set processor" and a "script

17   processor," so we have agreed that those mean software

18   components.

19         THE COURT:  Slow down just a minute here.  Let me

20   catch up with you.  Did you say "metadata database"?

21         MR. O'NEILL:  Yes, sir.  It is Element (b) of the

22   first claim.

23         THE COURT:  What did you agree on?

24         MR. O'NEILL:  We agreed -- it is on the right-hand

25   side there, "a database that stores the logical import and

1    export data interfaces, data transformation rule sets and

2    scripts used by the system."

3            THE COURT:  All right.  What was the next one?

4            MR. O'NEILL:  The next one was "data bag," which is

5    at the very end of Claim 1.  It is on Page 3 of the printout.

6            THE COURT:  On what page of your claim chart?

7            MR. O'NEILL:  On Page 3.  It appears in Element (d),

8    "data bag."  The agreed construction is in the row beneath

9    that.

10           THE COURT:  You don't have your pages numbered here.

11    Page 3.  All right.  "Data bag."

12      (Pause in proceedings.)

13           THE COURT:  All right.  What is next?

14           MR. O'NEILL:  And then I mentioned that we reached

15    agreement about the use of the term "component" in two of the

16    constructions.  That agreement resolves only some of the

17    issues concerning "script processor" and "rule set processor."

18    So if you look at Element (c), which is on Page 2 of the

19    chart, the "script processor," although it is still disputed

20    in a global sense, we did agree last night that it is a

21    "software component."  So you will see that in the competing

22    constructions they both now say "software component."

23           THE COURT:  All right.

24           MR. O'NEILL:  And the same for "rule set processor"

25    which is on Page 3.  "Rule set processor," we have all agreed,

1    is a "software component," although there are other

2    differences still in the constructions.

3              THE COURT:  All right.  Anything further?

4              MR. O'NEILL:  If the Court has a specific sequence

5    in which you would like for us to deal with the terms, we are

6    receptive to it.  It seems like "script" got most of the

7    attention in the briefs.

8              THE COURT:  Have y'all discussed an agreed method of

9    proceeding?

10             MR. O'NEILL:  We have.

11             THE COURT:  That will be fine.

12             Do the defendants wish to make an opening statement

13   before we begin?

14             MS. HUNSAKER:  Yes, Your Honor.  First I'd like to

15   thank Mr. O'Neill and JuxtaComm for what I thought yesterday

16   was a very cooperative dialogue --

17             THE COURT:  I thank you both.

18             MS. HUNSAKER:  -- on narrowing the disputes and

19   really trying to focus today on the main disputes between the

20   parties and the things that really matter.  We appreciate that

21   from the side of the plaintiff.

22             In this case JuxtaComm is trying to expand the

23   meaning of the claims really beyond anything that is supported

24   in the specification.  They entered into a crowded field and

25   right out of the chute in the file history acknowledged that

1 there was art out there that did what they did.  And as a

2 result of that, they define some terms very narrowly.  Now

3 they want it both ways so that they can apply one construction

4 for infringement in order to get the patent allowed.

5    They rely heavily on extrinsic evidence, and we

6 think that the defendants' constructions align most closely

7 with the claim language, with the specification, and with the

8 file history.

9    As Mr. O'Neill noted, really the main dispute

10 today -- there are others and we are prepared to talk about

11 all of them to the extent that the Court wants to have

12 argument and to the extent that it is necessary, but the main

13 dispute between the parties and I think where a lot of the

14 argument will focus, obviously, is on the "script" and "script

15 processor" terms and in particular whether those terms require

16 text commands that are interpretively executed --

17    THE COURT:  Where they require what?

18    MS. HUNSAKER:  Whether they require text commands as

19 opposed to some visual representation.  And, secondly, whether

20 those commands are interpreted by the script processor and

21 what that means.

22    THE COURT:  Okay.

23    MS. HUNSAKER:  The defendants' position is that

24 those terms have very clear meaning in the ordinary course of

25 things to people of ordinary skill in the art at the time that

1    this application was filed.  And the plaintiffs' construction,

2    on the other hand, essentially boils it down to any commands

3    executed by any software and we think read those limitations

4    out of the claims.

5            THE COURT:  Thank you.  What will be the first

6    term?

7            MR. O'NEILL:  It will be "scripts," Your Honor.  The

8    word "script" and "script processor" which processes the

9    scripts.  We have the same issues or areas of disagreement

10   between the competing constructions.  So in my presentation I

11   have kind of combined those two because the issues are

12   identical.  And Ms. Hunsaker has graciously agreed to let me

13   proceed on that basis.  And she did a very nice job describing

14   the three issues around "script," but let me do it again just

15   so we are clear.

16           Our construction is on the left on the screen.  The

17   defendants is on the right.  And there is some commonality

18   between the two, but there are three key areas of departure.

19           Number one, defendants say that scripts must be

20   interpreted or interpretively run, and they say that the

21   prosecution history so requires.  We think that is not right,

22   and we will show you why it is not.

23           Number two, they say that because scripts must be

24   interpreted, they have to be run or executed or processed in a

25   very specific way.  They say that it means that one command at

1   a time must be translated and executed at run time before the

2   next command is translated and executed.  We will show you

3   that is a very narrow, almost an old-fashioned meaning of the

4   word "interpret" when we look at software interpreters and the

5   state of the art and software interpreters.  So that is too

6   narrow and too limiting even if "interpret" does go into the

7   construction.

8          Number three, the third issue is whether the

9   ordinary meaning of "scripts" encompasses all types of

10  scripts, including graphical scripts.  Our position is that it

11  includes all types of scripts; that it is not limited to

12  textual scripts or any specific type of scripts.

13         The issue that garnered most of the briefing was

14  whether or not a "script" must be interpreted.  The defendants

15  are asserting that the prosecution history is clear; and that

16  scripts were limited to interpreted scripts during the

17  prosecution.  They claim now it is not an issue of disavowal

18  of scope, but instead they are using the prosecution history

19  simply to construe or arrive at the ordinary meaning of the

20  term "script."

21         I think when you look at the prosecution history,

22  you will see that is not what is occurring.  They are trying

23  to limit and narrow the claim scope by a single statement that

24  was used in the -- that was made in the prosecution history.

25         Moreover, they ignore that the significant part of

1  the prosecution history, the part that gained the allowance of

2  the claims in the patent were the amendments that were made.

3  All of the claims were amended at the same time identically in

4  the same fashion to overcome the prior art, and there were

5  remarks that accompanied those amendments.  But the remarks

6  did not put forth additional arguments or distinctions or

7  further narrow the claim beyond the amendment.  And I have the

8  amendments.  I will show them to you momentarily.  But the key

9  is that the amendment pointed up the distinction that the

10  prior art, the principal prior art reference that was relied

11  on to reject claims was this Morgenstern patent.  And the

12  amendment says, "We distinguish over Morgenstern because

13  Morgenstern doesn't use metadata from a metadata database to

14  control data transformation."  And that is the language of the

15  amendment, and that was the nature and the essence of the

16  remarks that were made to simply reinforce --

17          THE COURT:  How did Morgenstern do it if it doesn't

18  use metadata?

19          MR. O'NEILL:  Very good question.  Here he comes.

20  This is Morgenstern, and the simplest figure that he shows.

21  Morgenstern is a data transformation tool.  However,

22  Morgenstern is what was called a single-instance

23  transformation tool for a single, let's say, input or source

24  and a single output.  So I have highlighted at the top of

25  Figure 2 of Morgenstern the source formatting information.

1    And on the left side I have highlighted the target formatting

2    information.

3              And what Morgenstern does is -- that green block

4    there in the center -- that accepts the source format

5    information and the target format information, as well as the

6    transformation rules from up above.  And it churns all that.

7    And at the bottom it spits out a purely compiled, ready-to-go

8    single transformation tool that is suitable only for

9    transforming data from a single input format or source format

10   to a single target format.

11             So if you look at the bottom of the figure, you will

12   see on the left it is actually the input data, and it is

13   feeding into the orange block, which is this compiled, you

14   know, situation-specific program.  It can run on a computer

15   and spit out on the lower right the data for the target

16   computer.  One input format, one output format.

17             THE COURT:  Okay.  Response.  Leave that one up, if

18   you would.

19             MS. HUNSAKER:  I'm sorry?

20             THE COURT:  I was telling him to leave that up, if

21   you would.

22             MS. HUNSAKER:  Sorry.  Let me get the right one up

23   there.  We, respectfully, disagree with JuxtaComm that the

24   Morgenstern reference was limited to code that is fully

25   compiled to machine code.  In fact -- and this is in Exhibit

1  G, which is the Morgenstern patent to my declaration in Column

2  25 between Lines 15 and 45.  Morgenstern discloses that, in

3  fact, while you can use an information mediator bridge to

4  compile, it also recognizes that if an interpreted language

5  such as Lisp or Smalltalk is used, then the operation

6  distinction between these phases would not be as noticeable as

7  an interpreted language can both analyze and generate code and

8  then proceed to execute that code all in the same process.

9        Going down to the second highlighted box,

10  Morgenstern also discloses that a way to practice his

11  invention is that interpreted languages, such as Lisp, TCL/TK

12  or Perl provide an "eval" -- that's quote, E-V-A-L -- operator

13  that allows source code generated by a program to be

14  interpreted and executed by the program that created it.

15        And then I think the final box that is called out

16  here is particularly relevant to JuxtaComm's argument that

17  intermediate compilation would not have been within the scope

18  of what they disavowed.  That is when Morgenstern also says

19  there are two viable alternative solutions.  The first is to

20  create an internal language and interpreter for the

21  intermediate representation and use that for the description

22  and the interpretation.

23        So the suggestion that in disclaiming what was

24  taught by Morgenstern, it was limited to machine code

25  compilation, is not true because, in fact, Morgenstern itself

1    also taught intermediate format compilation.  So we believe

2    that the format of the compilation, whether it is intermediate

3    format or to machine code was not relevant to what they were

4    telling the Patent Office was the point of novelty of their

5    invention.

6          THE COURT:  Response?

7          MR. O'NEILL:  Your Honor, Ms. Hunsaker is actually

8    making my point, so let me be clear.  I agree that the

9    Morgenstern patent does talk about interpretation and not

10    exclusively compiling.  Our point is that we did not in the

11    prosecution distinguish using a specific processing technique,

12    interpreting or compiling.  What we distinguished was the use

13    of information from a metadata database.  And that is the

14    claim amendment.  So what I would like to do is show you the

15    claim amendment to see that it has nothing to do with whether

16    scripts are interpreted, compiled using some intermediate form

17    of processing.

18          Holly, can you show us the next slide.

19          The examiner -- before we show the amendment -- the

20    examiner says Morgenstern -- he acknowledges Morgenstern does

21    not expressly teach a metadata database.  That was the --

22    where Morgenstern was lacking.  He didn't say it implicitly

23    teaches it either.  He says let's go to the Mitchell patent,

24    another patent and they have got a metadata database and he

25    makes the rejection saying it would be obvious to combine.

1    Here comes the amendment and here comes the distinction.  The

2    amendment was, hey, we don't just have a script processor and

3    a metadata database, we have a script processor that uses

4    metadata from the metadata database to control all of this

5    data transformation.  So it has nothing to do with

6    compilation, interpretation, or the specific processing --

7         THE COURT:  You are saying your patent would not

8    read on anything that did not rely on metadata?

9         MR. O'NEILL:  That is correct.  Metadata from a

10   metadata database.  And, in fact, all of the claims where I

11   have amended using identical -- virtually identical language,

12   that is the amendment to what is now Claim 1.

13        Holly, could we see the amendment to what is now

14   Claim 13.

15        The amendment is that the script processor utilizes

16   metadata stored in a metadata database to control this data

17   transformation.  The added language is underlined, Your

18   Honor.  Again, issued in Claim 17, the added language "script

19   processor for utilizing metadata from a metadata database to

20   control data transformation."

21        THE COURT:  We will get to interpretive or

22   compilation in a moment.  But, Counsel, I didn't really hear

23   in your response or response to his argument that they

24   distinguished over Morgenstern based on the metadata.

25        MS. HUNSAKER:  The arguments are related.  The

1  amendment --

2          THE COURT:  Do you agree they are related, Counsel?

3          MR. O'NEILL:  Tangentially related, but not related

4  in the sense that it impacts the claims.

5          THE COURT:  All right.

6          MS. HUNSAKER:  They are really fundamentally

7  related.  The portion of the file history in which JuxtaComm

8  linked the amendment that it was making with its distinction

9  between Morgenstern's compilation and the patented invention's

10 interpretive solution is up on the screen now.  This is

11 Exhibit F in the papers.  And initially in describing

12 Morgenstern, JuxtaComm said that Morgenstern teaches directly

13 away from the claimed inventions.  Morgenstern's compiled

14 information mediator bridge is inflexible.

15         This isn't highlighted, but the next sentence after

16 that says, "If either the source or the target database

17 structure are modified, the entire process must be reexecuted

18 and new information mediator bridge compiled."  So, in other

19 words, once the compilation of the entire process occurs, the

20 source and the rules and the destination are fixed, so you

21 can't access metadata at that point in order to provide a

22 flexible solution.

23         Going on to the next paragraph, JuxtaComm very

24 clearly stated that in contrast, as noted above, the invention

25 uses a script processor.  And here is where JuxtaComm linked

1 their amendment to their argument.  The invention uses a

2 script processor which utilizes metadata stored in a metadata

3 database to interpretively convert data from a source to a

4 target format.  The ability to use that metadata during

5 execution of the script processor is what gives it its

6 interpretive nature in contrast to the Morgenstern solution

7 that compiles the whole thing, fixes it, whether it is to some

8 intermediate format or to machine code, at which point it

9 couldn't access metadata if it was there, without recompiling

10 it.

11   So to argue that the amendment and these arguments

12 are unrelated or even to argue that they are only tangentially

13 related, does not match up with the intrinsic record.

14   MR. O'NEILL:  Two things --

15   THE COURT:  Okay.  So you are saying it is not

16 really the metadata, but it is the use of the word

17 "interpretively"?

18   MS. HUNSAKER:  The interpreted nature of the

19 solution allows them to access the metadata.  So the

20 "interpretively" portion of this argument is the key phrase,

21 and it is not unrelated to the amendment that was made.

22   THE COURT:  Okay.  Response?

23   MR. O'NEILL:  Two responses.  Number one, Ms.

24 Hunsaker started out her argument by pointing out that the

25 Morgenstern patent mentioned interpretive techniques.  So the

1    use of the word "interpret" by the patentee in our case could
2    not have been enough to distinguish.

3        Second of all, she has shown you only one of the
4    sentences that accompanies the claim amendments and explains
5    and says what the claim amendments are about and talks about
6    why the claimed invention is different.  If I may, I can show
7    you all three so we can have a full picture.

8        THE COURT:  All right.

9        MR. O'NEILL:  Holly, can we go back to 2 -- I'm
10   sorry.  The remarks on 2.

11        You will recall, Judge, that all three independent
12   claims were amended.  In the application they were Claims 2,
13   14, and 18.  So let me show you first the remarks accompanying
14   Claim 2.  In stark contrast, the applicants' script processor
15   plays the key role in the conversion and uses the metadata
16   database associated with a conversion.  What he is saying is,
17   hey, I have amended claims to say that I used metadata from
18   the metadata database and that is why I am different.

19        Notice he goes on to talk about scripts, but he
20   doesn't say they are interpreted.  It says they are executed,
21   which doesn't impart any specific processing technique or
22   parameter on the scripts.  Similarly --

23        THE COURT:  Go back to that one, and let me get
24   Counsel's response to that one.

25        MS. HUNSAKER:  There is no distinction there between

1    executing and interpreting.  The way that an interpreter runs

2    a script is it translates and executes each command, so I

3    don't think there is a material distinction by calling it --

4                THE COURT:  Doesn't a compilation involve execution,

5    as well?

6                MS. HUNSAKER:  Compilation is a step before

7    execution.  And in compiled solutions first the whole program

8    is compiled or the whole script is compiled; like the

9    translation of a book is the example that we used in our

10   tutorial.  Executing a script is not using materially

11   different language than interpreting the script.  You can say

12   you run a script, and it will still be interpreted.  You can

13   say you execute a script, and it is still interpreted.

14               THE COURT:  Response?

15               MR. O'NEILL:  It is nonspecific as to the processing

16   technique.  It says "execute."  The other remarks also use

17   slightly different terminology, not interpret.  This is the

18   remark accompanying the amendment to Claim 14.  And you see,

19   it begins by focusing on the words that are actually in the

20   claim amendment.  A script processor that utilizes metadata

21   stored in a metadata database to control the loading of data.

22   And then reading through the specific processing technique,

23   there really is none.  It says performing the script commands.

24   I am sort of paraphrasing for you, Judge, there.  But the last

25   part of the sentence is performing, and then there is one or

1    more script commands here.  This is the remark accompanying

2    the Claim 14 amendment.  It mentions no specific processing

3    whatsoever.

4            THE COURT:  Response to that one.

5            MS. HUNSAKER:  There is no rule of law that every

6    argument made in every sentence of the prosecution history has

7    to say the same argument and the same thing.  In fact, the law

8    is to the contrary that any arguments made in support of

9    patentability are properly used to construe the claims.  We

10    don't think that pointing to the next paragraph after the

11    patentee very clearly said Morgenstern teaches away and in

12    contrast we do it interpretively, disembodies this statement

13    from that one.

14            THE COURT:  Okay.  Counsel?

15            MR. O'NEILL:  The law, Your Honor, is -- it was on

16    our second slide, Purdue Pharma v. Endo Pharmaceuticals.  The

17    law is that if there is going to be a surrender of claim scope

18    by argument -- and that is all we are talking about here --

19    well, I think they are remarks.  I don't think they are

20    arguments.  But even if they were arguments, we can't have a

21    disavowal unless it is clear and unmistakable.  There is

22    nothing clear and unmistakable about using the word

23    "interpret" one time in a set of three remarks, each of which

24    accompanies a claim amendment that is crystal clear on its

25    face.  The remarks --

1          THE COURT:  Counsel, let me ask you why you believe

2    this rises to the level of a clear and unmistakable disavowal?

3          MS. HUNSAKER:  Well, I am glad you raised that

4    because I would like to actually frame what defendants'

5    argument actually was.

6          THE COURT:  Okay.

7          MS. HUNSAKER:  We have said from our responsive

8    brief and also in our surreply responding to JuxtaComm's

9    insistence that our construction is based on disavowal, that,

10   in fact, our construction is the ordinary meaning of the term

11   supported by the specification, which I would like to talk

12   about at Slide 21 when the Court is ready to move away from

13   the file history.

14         THE COURT:  So you are not really asserting

15   disavowal then?

16         MS. HUNSAKER:  There is unmistakably and clearly a

17   disavowal of claim scope in this patent and in this file

18   history and the arguments we have just discussed.  The

19   amendments made from the prior art saying that Morgenstern

20   teaches away and in contrast to that prior art JuxtaComm

21   executes the scripts interpretively.  What we are saying,

22   however, is that our construction defines what the ordinary

23   meaning of a "script" is in view of this specification and

24   this file history at the time of the invention.  You do not

25   have to find disavowal in order to adopt the defendants'

1    construction because we believe that it is ordinary meaning.

2         THE COURT:  Let's talk about where you find that in

3    the specification.

4         MS. HUNSAKER:  Okay.  Marc, could you go to Slide

5    21.  This is on Slide 21, Your Honor.

6         Now, I will tell you that the specification does not

7    use the word "interpreted"; but the only solution described in

8    the specification very clearly is an interpretive solution.

9    And no alternative solution, even though JuxtaComm says that

10   this was all well-known; that you could do it all kinds of

11   different ways, no compiled solution is ever disclosed.

12        So, initially, if you look at Column 4, Lines 43

13   through 45 of the patent it says that the script processor

14   identifies the script command and then invokes the correct

15   method for that script command.

16        THE COURT:  Does it say where it gets the correct

17   method?

18        MS. HUNSAKER:  From the other context of the patent,

19   they would get the script from the metadata database while the

20   script processor is executing.

21        Now, the reason you can tell that this is an

22   interpretive solution and not a compiled solution is that the

23   script processor first has to identify whether this command is

24   even there in the first place; and if it is, they have to

25   translate it into executable form and then execute it before

1    going on to the next one.

2         The Figure 6 is a good illustration of this point.

3    Figure 6 illustrates the eight text commands that JuxtaComm

4    said was their invention, and there is a decision tree at each

5    command.  You go to load and there is a "Y" and a no.  Is

6    there a load command?  And if so, you load the data bag.  And

7    then you go back.  Is there a save command?  And if there is,

8    you save the data bag to an external target and then you go

9    back.  Is there a merge command?  And if, so you merge the

10   two.  And so on.

11        Now, if this was a compiled solution, Your Honor,

12   there would be no decision tree between these commands.  If

13   this were a compiled solution, you would have a line straight

14   down the middle of Figure 6 where those Y's are.  All of the

15   analysis would be done at once.  And then the processor of the

16   computer would be getting a stream of 1's and 0's or a stream

17   of bytes.  So the fact that you have to analyze each command

18   separately, figure out if it is there in the first place, and

19   then go to the metadata database to pull it in and invoke it,

20   this can only be an interpreted solution.

21        THE COURT:  Response?

22        MR. O'NEILL:  Your Honor, the target that I am

23   shooting at seems to be moving.  First I heard the defendants

24   say that they thought there was a clear and unmistakable

25   disavowal from a prosecution statement made.  Now we have

1    moved on to the detailed description of the invention and the

2    preferred embodiment.  I am not sure how -- I don't think we

3    disagree that an embodiment to the invention may be

4    interpreted.  But that is not the limitation of the claim

5    scope.  So if we are starting from the premise that the patent

6    discloses one specific embodiment, we don't disagree.

7           THE COURT:  Okay.  Response?

8           MS. HUNSAKER:  This is not disclosed as an

9    embodiment of the invention.  This is disclosed as the

10    invention.  If you look in the specification, the first time

11    that JuxtaComm begins talking about the preferred embodiment

12    is after the discussion of this.  And if I could find the

13    correct slide I will direct the Court's attention to the

14    column.

15           So in Column 6, Line 38, which is after this is

16    described as the script processor of the present invention,

17    JuxtaComm then turns to describing an example of the preferred

18    embodiment.

19       (Pause in proceedings.)

20           THE COURT:  Response?

21           MR. O'NEILL:  The argument keeps changing as I stand

22    here, Your Honor, because this argument is not in their

23    brief.  I understand Ms. Hunsaker now to be saying it is

24    defined as the invention and its interpretive scripts.  It is

25    not in their brief, but I am happy to answer that.  The

1    summary of the invention spans Columns 1 and 2 and then the

2    description of the figures, and then we have the detailed

3    description which runs for a full four columns, including

4    virtually every specific reference numeral to the preferred

5    embodiment illustrated in the drawings.

6          So it is clearly not correct that everything after

7    detailed description of the invention continues to be the

8    summary and limits the claims with every specific example and

9    every detail in Columns 3, 4, 5, and 6.  It can't be the

10    case.  We would have virtually no preferred embodiment left

11    and no claim scope.

12          THE COURT:  All right.  Okay.  Very well.

13          What is our next term?

14          MR. O'NEILL:  We are still on "scripts."  The next

15    issue is whether if they are interpreted it must be one

16    command at a time as in the defendants' construction.  I am

17    happy to address that if you wish.

18          THE COURT:  All right -- why don't we let defendants

19    address that first and then you can respond.

20          MS. HUNSAKER:  I'm sorry, Your Honor, address --

21          THE COURT:  The other part of "script," whether it

22    has to be one at a time.

23          MR. O'NEILL:  Actually that is not the one I was

24    referring to, the one command at a time.  If you don't want to

25    do that separately, I would --

1          MS. HUNSAKER:  No, you are right, Kirt, we should
2   address the one command at a time.
3          So, Your Honor, putting the slide back up that we
4   were just discussing, clearly in the specification JuxtaComm
5   describes the script processor of the present invention as
6   performing one command at a time, translating and executing
7   that command before going on to the next, and that is what
8   Figure 6 depicts.
9          We believe that the way that JuxtaComm used that
10  term in the specification and in the file history is
11  consistent with the ordinary meaning.  I am going to scroll
12  through a couple of these because these are dealing with the
13  interpreted point that we already addressed.
14         So on Slide 27 -- and again this is consistent with
15  Figure 6 and the portion of Column 4 that we were talking
16  about -- the defendants' construction really is consistent
17  with the plain and ordinary meaning of "interpret"; and
18  JuxtaComm spoke in its reply as if we just cherry-picked the
19  few definitions of "interpreted" so we could come up with the
20  one that we wanted.  But, in fact, consistently you can go
21  through and look at all of the dictionary definitions which
22  support what is in JuxtaComm's specification.
23         The IEEE software glossary of engineering
24  technology -- terminology, "to translate and execute each
25  statement or construct of a computer program before

1    translating and executing the next."  Contrast with compile.

2    That is at Exhibit N.

3           The next one, "interpret, to execute a program by

4    translating one statement at a time into executable form and

5    executing it before translating the next statement."  That is

6    Exhibit P.

7           The next one Prentice Hall's Illustrated

8    Dictionary.  The interpreter converts and then immediately

9    executes each statement line by line.  That is Exhibit Q.

10          The Computer Glossary, "interpret, translates one

11   program statement into machine language and executes it and

12   then proceeds to the next statement."  Exhibit M.

13          The next exhibit IBM Dictionary of Computing --

14          THE COURT:  I think we have covered enough

15   dictionaries.

16          MS. HUNSAKER:  So we didn't cherry-pick this.  This

17   is truly exhibited in a wide range of definitional sources at

18   the time of the invention, and we aren't relying on that

19   exclusively.  We are relying, in fact, on the description of

20   the invention in the patent, which was the slide that we

21   discussed before.

22          THE COURT:  Thank you.

23          Response?

24          MR. O'NEILL:  Your Honor, the Federal Circuit has

25   been pretty clear, indiscriminate reliance on definitions

1  found in dictionaries can often produce the wrong results.

2  That is the Renishaw case, 158 F.3d, 1243.  Dictionary

3  definitions don't always reflect the use of terms by people

4  skilled in the art.  In fact, the Federal Circuit has said

5  don't look just at dictionaries, look at extrinsic evidence

6  that show how people actually use the term in the art.

7           And we have three pieces of what I think you will

8  find to be compelling extrinsic evidence.  The first is

9  Microsoft's own patent from 1995 discussing prior art.  This

10 is two years before the JuxtaComm patent was filed, and they

11 are discussing interpreters.  Now, Microsoft pointed out in

12 their surreply brief that this actually is a patent on virtual

13 machines.  That is true.  But in this passage in their patent

14 they are talking generally about the art of software

15 interpreters, the prior art.  And they make the point to say

16 that, hey, these are modern times, we have had interpreters

17 for decades; but by the '90s for efficiency many interpreters

18 first convert the program into a compact representation, such

19 as byte codes, and then they use a wide variety of approaches

20 to execute them.

21           So what they are saying is translate the whole

22 program first, and then execute the whole program.  Don't

23 translate and execute one at a time because it is too slow.

24           In addition, I have textbooks, which we think are

25 much better evidence on how people skilled in the program

1    interpretation art, show how they use the word "interpreter."

2        Holly, could we see the 1971 textbook.

3        This is a college undergraduate course on computer

4    science compilers and interpreters.  This is published by John

5    Wiley & Sons, 1971.  They talk about interpreters.  In fact,

6    they purport to set forth a definition here.  If I could

7    direct your attention to what is underlined in blue.  Even by

8    1971 the usual method of interpretation is to process the

9    program in two phases.  The first translates it.  I am going

10   to paraphrase a little bit, Judge, to shorten this up.  The

11   second phase executes it.  So you translate the entire program

12   and then you execute it.

13       Significantly, the first part of that paragraph,

14   which I have highlighted in yellow, talks about a form of

15   interpretation that the defendants are trying to force on us

16   here, and they are talking about the pure or early form of

17   interpreters from the '50s or '60s.  It says in the pure

18   interpretation form, you analyze a source program statement

19   each time it is executed in order to discover how it performs

20   the execution.  That is their construction of "interpret."

21   The textbook, 1971, says this, of course, is very inefficient

22   and is not used very often.

23       I have another textbook 1993, just four years before

24   the JuxtaComm patent was filed.  This is Addison-Wesley

25   Publishing, again, for an undergraduate computer science

1   course on programming languages.  It starts out saying an

2   alternative to compiling is interpreters.  Here is where it

3   gets into the breadth of what the interpreters involve by the

4   '90s.  "An interpreter can directly execute a source

5   program" -- that is the defendants' construction one line at a

6   time -- "but what is more common is for a source program to be

7   translated into some intermediate form, which is then executed

8   by the interpreter."

9       So textbooks show how it is used in the art.  Your

10   Honor, I acknowledge these were not in our brief, but we just

11   think they are compelling.  I have copies for the Court and

12   for the technical advisor just of the relevant pages, if you

13   would like them.

14       THE COURT:  Any objection?

15       MS. HUNSAKER:  No, Your Honor.  I don't mind moving

16   targets.

17       THE COURT:  Would you like to respond?

18       MS. HUNSAKER:  Yes.

19       THE COURT:  Okay.

20       MS. HUNSAKER:  The Microsoft patent that they have

21   cited to is completely irrelevant.  It is completely extrinsic

22   evidence.  While we agree with Renishaw that indiscriminate

23   use of dictionaries is not permitted, we think we have shown

24   the Court through the specification and the file history that

25   it is not, indeed, indiscriminate use of the dictionaries but

1    dictionaries that, in fact, confirm the ordinary meaning used

2    in the intrinsic evidence.

3          Now, with respect to the idea that solutions have

4    been developed that partially compile an interpreted piece of

5    code to some intermediate solution, it still then interprets

6    it when it is run.  This idea of compiling to an intermediate

7    format rather than all the way to machine code, is not at all

8    inconsistent with the defendants' construction.  And this is

9    where we get into the disavowal rather than the affirmative

10   definition that we have put into our construction.

11         Our construction describes what a "script" is.  What

12   we talk about when we discuss JuxtaComm's disavowal in the

13   file history is what a "script" is not.  There is no

14   distinction in their arguments in the file history whether

15   something is compiled to an intermediate format or whether

16   something is compiled to machine code.

17         So to the extent there are solutions that are added

18   onto interpreters, to the extent that there are ways that

19   programmers have devised code to make interpreters run more

20   efficiently, when you look at the file history, JuxtaComm has

21   disclaimed those when they compile the entire process because

22   at that point you can no longer access your metadata database

23   to get your sources, your transformation rule sets, and your

24   targets.

25         THE COURT:  Okay.  Final word.

1        MR. O'NEILL:  Holly, can we see Slide 14.

2        The specification, Your Honor, doesn't support such

3  a narrow interpretation of "interpreter."  It doesn't support

4  using "interpret" as part of your construction at all.  To the

5  contrary, it says variously we will run scripts, we will

6  execute scripts, we will perform scripts, we will just process

7  scripts.  And this is consistent with the prosecution remarks

8  that were made, the ones I showed you earlier which had no

9  limitations on processing technique.  The key was we utilize

10  metadata from a metadata database.

11       THE COURT:  All right.  Let's go on to what would be

12  next, and I will let defendants go first.

13       MS. HUNSAKER:  Okay, Your Honor.  Because it is very

14  related to what we have been discussing, we are going to argue

15  "using metadata from a metadata database" next.  I will have

16  to find that.  Oh, actually -- I apologize -- we still have to

17  fight about "text."

18       THE COURT:  So which one are we doing?

19       MS. HUNSAKER:  Well, so -- Kirt, we haven't gotten

20  to the text point.

21       There is still one area of dispute that we haven't

22  covered with respect to "script" and "script processor."

23       THE COURT:  All right.

24       MS. HUNSAKER:  And that is whether the ordinary

25  meaning requires text commands or can also include visual

1    representations.  So we are actually still on Kirt's term.

2            MR. O'NEILL:  We are still on "script"; I'd be happy

3    to let her go first.

4            THE COURT:  All right.  Go ahead.

5            MS. HUNSAKER:  So, Your Honor, at the time of

6    JuxtaComm's alleged invention with the provisional application

7    filed in '97, "scripts" were commonly understood as a short

8    program of text commands.  The specification that we cited

9    before describing Figure 6 -- excuse me.  In the summary of

10   the invention, JuxtaComm says that it is another object of the

11   present invention to provide a script processing language that

12   defines operations, not selects them or drags and drops them

13   but actually defines them.

14           In the specification there is also dependent claims

15   that support the defendants' proposed construction that these

16   are, in fact, text commands.  Dependent Claim 10 talks about

17   script control language.  Dependent Claim 11 says that said

18   script control language comprises a set of script commands and

19   then the processor executes -- there is also a script command

20   processor to process and execute each of a number of script

21   command lines.

22           JuxtaComm admits in their reply brief -- or excuse

23   me -- in their opening brief at Page 12, that this is, in

24   fact, referring to lines of text.

25           And then, finally, in Dependent Claim 12 it talks

1    about a system wherein a set of script commands comprises the

2    load save, and so on and so forth.

3           It is interesting to note that JuxtaComm's

4    preliminary claim construction of "script" was a group of

5    commands in a script control language.  That was subsequently

6    dropped.  But this is part of the language of the spec that we

7    believe demonstrates that these are lines of text.

8           JuxtaComm will argue that, in fact, what these show

9    is a claim differentiation argument, but that is not true

10   because in Independent Claim 1 what the claim is referring to

11   is a "script."  And what is referred to in Dependent Claim 10

12   through 12 is the language by which those "scripts" are

13   entered.

14          This was the slide I was looking for before, but at

15   Column 5, Line 55 and then carrying over to Column 6, this is

16   where Figure 6 is described.  And, again, it is -- Figure 6 is

17   a flow diagram showing the actions taken by the script

18   processor of the present invention, not the preferred

19   embodiment, not an example but the present invention, and then

20   the text commands which JuxtaComm agrees are text commands are

21   then set forth in the specification.

22          In Figure 8 an exemplary script, and this is an

23   exemplary script.  It also depicts the text commands of

24   loading a particular source of formatting it and then saving.

25   Again, text commands are there.  I won't belabor the

1  dictionaries again.  They are cited in our papers, and they

2  are in the exhibits.  But there are a number of dictionaries

3  that also support what is in the specification; that scripting

4  language have several defining characteristics; it is

5  generally stored as plain text not a compiled binary.  Again,

6  you can see the relation to the disclaimer and the arguments

7  in the file history.  The programs are entered with any text

8  editor.  The next one "script" is commands that could have

9  been entered by a keyboard or English-like commands,

10         Now, JuxtaComm has cited -- there was one cited in

11  their opening brief that talks about something referred to as

12  visual scripting.  And, again, we don't think these are

13  relevant in any way, shape, or form to the claim construction

14  issues.  These are purely extrinsic evidence, not rising even

15  to the level of dictionaries.  The one they cited in their

16  opening brief specifically said, you know, this is just a

17  prototype.  And there is no way to know the correct

18  functionality and the proper interface can be totally

19  anticipated.  So at this point in time the people that were

20  out there trying to create visual scripting were saying, you

21  know, it looks promising but we just don't really know how to

22  do it yet.

23         These are the articles that were cited in

24  JuxtaComm's reply.  They are all to the same effect.  None of

25  them are dictionaries.  None of them have been adopted by the

1    dictionaries.  None of them are supported by the

2    specification.  They talk about a prototype -- and I apologize

3    for not having the exhibit numbers on these, but these were

4    exhibits attached to JuxtaComm's reply brief.  The first

5    excerpt up there says, you know, we plan to bring this future

6    and the first prototype to the attention of users.  They are

7    already working in several areas of application development.

8    The next one, we have implemented a prototype visual scripting

9    too, and we are building a pilot system, and so on.

10        So to argue that these show people of ordinary skill

11    in the art understood the word "script" to include visual

12    scripting, couldn't be farther from the truth.  And, in fact,

13    this really supports the defendants' argument.  If the

14    researchers out there who were trying to implement these

15    prototypes and were struggling with doing that at the time or

16    just before JuxtaComm's alleged invention, the idea that their

17    patent somehow covers what these researchers were just

18    beginning to be able to figure out how to do, is not supported

19    by the specification, is not what they claimed in the

20    invention, and falls squarely within the line of cases that

21    you can't interpret a term beyond what is supported in the

22    written description.

23        THE COURT:  Response?

24        MR. O'NEILL:  Your Honor, visual scripting was well

25    known by 1997.  We have copious extrinsic evidence on that.

1  The issue of whether the specification for JuxtaComm talks

2  only about text is a red herring.  We don't deny that the

3  examples of scripts shown in the patent are composed of text.

4  But the question is whether people skilled in the art in 1997

5  would have understood that scripts mean graphical scripts as

6  well as text and whether they could create those types of

7  scripts.

8        These are not isolated research articles.  They span

9  a decade.  One of the earliest ones we gave you is from a

10  gentleman named Kappel.  He was writing in a publication that

11  was published by the Commission of the European Communities.

12  He says we have a visual scripting language.  He doesn't say

13  we have the first visual scripting language ever.  In fact, he

14  speaks about visual scripting as if the concept itself is

15  well-known.  He says we are doing a new one here, here is a

16  new language.  By the way, notice the use of the term

17  "language"; so in the JuxtaComm patent claims where they talk

18  about script languages, the word "language" doesn't limit it

19  to text.  They call visual scripting techniques, languages

20  also.  It is a language.

21        1991, a group led by Mr. Nierstrasz says he has a

22  visual scripting tool.  Again, he doesn't say we have the

23  first one.  He, in fact, speaks of visual scripting as

24  something that is relatively common.  He is just trying a

25  different tool, a different language.  In fact, here is a very

1    simple visual script or graphical script so you can see how

2    simple it is to create one of these things.  You drag and drop

3    icons from either a pull-down menu or off of a pallet.  You

4    put them on your desktop and you may label them with a

5    keyboard.  And then you put connections between the two.  And

6    once you have done that, if you have the right software behind

7    it, you have a script.  That is how simple it is.

8            In 1996, Mr. Shigesada, writing in by way of the

9    IEEE Computer Society Journal here in the United States, he

10   says he has a visual script language.  He calls his VACL.  But

11   the point is, visual scripts were known, they weren't magic,

12   and people knew how to do them.

13           Holly, can we show the next slide --

14           THE COURT:  Let me ask you this:  Is it necessary

15   for them to have been known in order for it to not be limited

16   to text commands?

17           MR. O'NEILL:  I don't know if it is necessary, but

18   we know they were known.  So as long as -- the only

19   requirement is that it be enabled.  Of course, you can't cover

20   things that people wouldn't know how to do other than,

21   perhaps, under the doctrine of equivalents, which is another

22   issue that we will get to.  But, clearly, people were enabled

23   to do this.  They knew how to do it.

24           On the left up there is a graphical programming

25   technique used by one of these defendants in this courtroom,

1    Ascential.  They have got a product.  This is from the

2    tutorial, Your Honor, from the mid-'90s.  They have some

3    graphical programming on the left.  You can see how simple it

4    is to create programs using icons and dragging and dropping.

5    The one on the right is a current visual script from IBM.  It

6    is one of the products in this case.  You can see how simple

7    it is.  This is a real-world product that does data

8    transformation.  Your Honor, that visual script is not

9    difficult, it is not hard.

10            THE COURT:  Final word on "script."

11            MS. HUNSACKER:  Your Honor, whether it was known by

12   some researchers around the corners of the world who were

13   trying things, whether it was known is not the standard for

14   whether it is ordinary meaning.  I think Counsel is confusing

15   the concepts of invalidity with the concept of whether at the

16   time of the alleged invention the ordinary meaning of "script"

17   was text commands and the written description of the patent

18   not supporting visual design tools as falling within that.  So

19   whether it was known is not the point.

20            None of these articles describing the research that

21   was being conducted were in the patent or in the prosecution

22   history.  Three of the six are from the same group of Swiss

23   researchers describing the same system, and they say we are --

24   only recently are we close to achieving the dream.  This is

25   not common and ordinary meaning.  It may show certain aspects

1    of invalidity.  It may show certain aspects of obviousness,

2    but certainly it does not show that it was ordinary meaning.

3    Three of the six don't mention "scripts" at all.  That is

4    another point which is JuxtaComm equating a visual design tool

5    with a script.

6              So we don't think there is any support anywhere,

7    either intrinsically or extrinsically to construe "script"

8    beyond text commands.

9              THE COURT:  Thank you.  What would be your next

10   term?

11             MS. HUNSAKER:  Now is the "utilizing" term.  So we

12   have actually already discussed quite a bit of this term

13   because it was central to their arguments during prosecution

14   about why the script processor executed the script

15   interpretively.  I have put here the parties' respective

16   constructions and that the dispute is whether "utilizing

17   metadata from a metadata database" means "accessing specific

18   metadata during execution of a script" or "using any metadata

19   at any time."

20             Now, I should pause for a moment and tell the Court

21   that Mr. O'Neill and I yesterday exchanged -- had some

22   dialogue whether there was any room for compromise on this

23   term.  And as they are currently written, there is really two

24   areas of dispute, two competing parts of the construction.

25   One is what is "metadata"?  Is it the "metadata" of the patent

1   or is it -- the common definition of "metadata" generally is

2   data about data, which could be file creation dates and all

3   kinds of things that would never let anybody do this

4   invention.

5          So one of the issues posed to Mr. O'Neill to see if

6   we could reach agreement was whether at least we agree that

7   the "metadata" referred to in this claim term is the logical

8   import and export data interfaces, the data transformation

9   rule sets, and then we had some discussion about adding

10  "script" to that definition of "metadata" because Mr. O'Neill

11  felt that that was missing.  I believe the consensus among the

12  defendants is that we could and probably should define

13  "metadata" consistently in this term as we have in the agreed

14  term "metadata database."  So I can help the Court with what

15  that would look like.

16         THE COURT:  Did you come to an agreement?

17         MS. HUNSAKER:  We didn't talking, but we were

18  talking late and early again this morning, so maybe when it is

19  Mr. O'Neill's turn he can speak to that point.

20         THE COURT:  All right.  Go ahead.

21         MS. HUNSAKER:  The second disagreement -- and this

22  is one that, unfortunately, we won't be able to reach

23  agreement on, is whether the script processor must use that

24  "metadata" at run time during execution of the script

25  processor as opposed to some other earlier point in time like

1    you might find in a compiled solution.

2            So I think it is important always to look at the

3    context of the claim.  This one in particular at Subparagraph

4    C is where it appears.  And it is a term that modifies the

5    "script processor" term.  Your Honor will remember the

6    discussion at the beginning of the argument about the file

7    history arguments that were made and the amendments that were

8    made; and, indeed, this was the phrase that was added to all

9    of the independent claims of the patent in conjunction with

10   JuxtaComm's argument about the script processor executing

11   interpretively.

12           So one of the agreed definitions that we came to a

13   compromise or an agreement on yesterday is "metadata database"

14   which is a database that stores these three things; the

15   interfaces, the rule sets, and the scripts.  So we all agree

16   that is what is in the "metadata database"; and we think that

17   is how "metadata" in this term should be construed.  And that

18   would require a slight modification from what we had

19   originally proposed, but we offer that --

20           THE COURT:  You are now adding "scripts," right?

21           MS. HUNSAKER:  I'm sorry?

22           THE COURT:  You are now adding in "scripts"?

23           MS. HUNSAKER:  Right.  That is in part --

24           THE COURT:  Is that in agreement?

25           MR. O'NEILL:  We do agree that it should be part of

1    the metadata that it is utilized, but I have asked how do they

2    intend to put that into their proposed construction because it

3    really doesn't seem to fit?

4            If y'all have a proposal --

5            MS. HUNSAKER:  Yeah.  And the way we would propose

6    that, going back to our definition -- and I apologize that I

7    don't have a slide with this on it.  I will certainly provide

8    that to the Court -- would be adding the word "and scripts"

9    after "rule sets" so that you access the logical import and

10   export data interfaces, data transformation rule sets, and

11   scripts from the metadata database --

12           THE COURT:  Where are you reading from?

13           MS. HUNSAKER:  There is the defendants' proposed

14   construction.

15           THE COURT:  For?

16           MS. HUNSAKER:  For "utilizing metadata."

17           THE COURT:  From the metadata database?

18           MS. HUNSAKER:  Yes.

19           THE COURT:  What is your proposed construction now?

20           MS. HUNSAKER:  So the modification would be to add

21   "and scripts" after "rule sets."  And instead of "during

22   execution of the script," it would be "during execution of the

23   script processor."

24           THE COURT:  "Of the script processor"?

25           MS. HUNSAKER:  Yes.

1          THE COURT:  Is that agreeable to plaintiff?

2          MR. O'NEILL:  Your Honor, it is not, for reasons

3     which I am happy to go into when it is my turn.

4          THE COURT:  Okay.  It is not agreeable.

5          MS. HUNSAKER:  And I know that he doesn't agree to

6     the part about "during execution of the script processor," and

7     I didn't expect that he would; but, perhaps, when he speaks he

8     can talk about whether "metadata" means anything different

9     than what is described throughout the patent.

10         THE COURT:  Okay.

11         MS. HUNSAKER:  Again, looking at some of the

12    intrinsic evidence, the summary of the invention says the

13    present invention can be used to create these things and to

14    control the usage of all those definitions in the process of

15    transforming and exchanging the data.  So, again, describing

16    this in the summary of the invention as the present invention

17    that this must be used during execution, this ties directly to

18    the arguments that they made in the file history, which was

19    that you use the script processor -- or the script processor

20    use the metadata in the metadata database to interpretively

21    run the scripts.

22         Some of the dependent claims, likewise, reflect that

23    particular metadata, an import data view or an export data

24    view is used during execution of the script processor.  So,

25    again, in order to make that amendment meaningful, these

1    "metadata" -- the "metadata" actually has to be used during

2    the execution of the script processor.  And, again, other

3    parts of the specification say that, you know, as will be

4    shown import data view will be used during the execution of

5    the script processor.  Data bag will be used during the

6    execution of the script processor.  The load command permits

7    an import data view to be used, and so forth.

8            We have already discussed this.  This was the term

9    that was added to all of the claims.  I won't go through this

10   again, but the same arguments that we were describing before,

11   really make this a dynamic process of accessing this metadata

12   database at run time, which you aren't able to do with the

13   solution that has already been compiled.

14           THE COURT:  Okay.  Response?

15           MR. O'NEILL:  Your Honor, I think what Ms. Hunsaker

16   said is we all agree that when it says "utilizing metadata,"

17   we know what that is; it is the three pieces of the "metadata"

18   that are set out in the claim.  It is the data interfaces, the

19   rule sets, and the scripts.  That part of it we all agree on.

20           If we look at their construction -- we started out

21   by saying no construction is needed.  The reason we said that

22   is because the claim already says what is in the metadata

23   database.  We don't think there is any need to repeat the same

24   thing.  But we are happy as an accommodation to have the

25   phrase construed to reiterate that "utilizing metadata" means

1    utilizing the logical import and export data interfaces, data

2    transformation rule sets, and scripts.

3         The problem with the defendants' construction is

4    that they impose an additional timing requirement through the

5    use of the word "access."  They would require that information

6    be accessed during execution of a "script."  It is not in the

7    specification, it is not in the prosecution history, and it is

8    an attempt to unduly limit the claims with no support.

9    Remember, the operative claim amendment was "utilizing

10   metadata from a metadata database."  It just means that you

11   have to use it.

12        None of the claims that Ms. Hunsaker showed you have

13   this timing requirement or this temporal requirement here.

14   All of the claim amendments that she showed you are consistent

15   with simply using the metadata at the appropriate time.  So

16   what we object to and what is clearly not right is "accessing

17   during execution of a script."  You won't find it anywhere in

18   the patent or the prosecution history.

19        THE COURT:  The final word on this one.

20        MS. HUNSAKER:  In our modified construction, which

21   we will provide to the Court, we did propose changing "during

22   execution of the script" to "during execution of the script

23   processor"; and we showed the Court all of the places in the

24   specification, including the summary of the invention, and

25   elsewhere where the metadata is, in fact, utilized during

1    execution of the script processor.

2            And I guess in closing, Mr. O'Neill's argument

3    demonstrates so clearly why it is so important to read the

4    claims not in isolation but in view of the specification and

5    the prosecution history.  If you are going to pull "metadata"

6    prior to some compilation and then compile it so it can't be

7    changed unless you recompile it and reexecute that all over

8    again, that is exactly what they said taught away from the

9    invention.  And that is exactly what they said they didn't

10   do.

11           So the temporal aspect comes from the fact that in

12   the prosecution history they said, you know, we don't do this

13   before because that is inflexible, and you have to redo the

14   whole thing if you do that.  What we do is utilize the

15   metadata database when the script processor interpretively

16   executes the script.  So we think this claim term read in the

17   context of the specification and the file history require that

18   that utilization occur during execution of the script

19   processor.

20           THE COURT:  Very good.  What is your next term?

21           MR. O'NEILL:  "Rule," Your Honor, I guess we are on

22   to "rule."  This will be short and sweet.

23           THE COURT:  All right.  Good.

24           MR. O'NEILL:  The audience is on the edge of their

25   seats, Your Honor.  "Rule" we say one or more statements.

1    There is at least some commonality here with the defendants'
2    construction, but they want to add a bunch of stuff to it.
3    And they do that by cutting and pasting from the
4    specification.  I will show you how.  And they --
5    significantly they add this requirement that the statements in
6    a "rule" have to be executed from top to bottom, which is not
7    correct because among other things -- among other reasons it
8    excludes some of the disclosed embodiments of the invention.
9          The common part of the construction that the parties
10   agree on comes from this sentence in the specification where
11   it says a "rule" is one or more statements.  I guess we all
12   agree that we look there.  That is what the sentence says.
13   That is virtually self-definitional.  By the way, the Federal
14   Circuit in the Sinorgchem case says when the patentee uses
15   "is" that can clearly signify that the patentee intends to
16   define something.  Here is what it is.
17         The defendants have gone further.  They get their
18   extra parts of their construction from the surrounding
19   sentences.  Above the part in the blue is their portion of the
20   construction dealing with what a "rule" might be used for.
21   Below is their part of the construction that says that the
22   statements must be executed from top to bottom.  We don't need
23   the purpose-oriented language from above.  The claim already
24   states what "rules" are used for.  And we certainly don't need
25   the stuff from down below.  Remember, this is set out in the

1  detailed description, so we have got a definitional statement

2  using the word "is" and we don't need anymore.

3         If we add the other stuff that defendants want to

4  add, what we do is we wind up excluding some of the disclosed

5  embodiments.  There is no intention in the patent, Judge, to

6  exclude these embodiments.  So Figures 9 and 17 from the

7  patent are examples that are set out, they are relatively

8  simple examples of "rules," and let me see if I can walk you

9  through these --

10        THE COURT:  That's okay.  Let me hear a response.

11        MR. PENSABENE:  Your Honor, the important point here

12  is that the parties agree that the term is defined in the

13  specification.  The only dispute here is as to what that

14  definition is, how much of the statement in the specification

15  needs to be included.

16        The defendants submit that all of the language

17  quoted on the screen now from Column 5 constitutes that

18  definition.  If I can read it, it says, "The purpose of a rule

19  is to perform a specific operation to achieve a desired

20  result.  A rule is one or more statements.  These statements

21  are executed from top to bottom."  And then it goes on.  In

22  each case using the word "is" or "are," as Mr. O'Neill pointed

23  out, is a sure sign that the patentee is defining the claim

24  term.

25        If you compare this language, this very precise

1  definition to what the defendants propose, you will see it

2  copies it almost verbatim.  The only difference is that the

3  defendants have kind of shortened it up a little bit to make

4  it a little more readable.  What the plaintiff would like to

5  do is take out one little snippet of that definition, one

6  piece of that definition, and put that forward as the entire

7  definition.

8      Under the Sinorgchem case, which Mr. O'Neill cites,

9  that is plainly the wrong approach.  That case clearly states

10  that you cannot just take a piece of the definition; you have

11  to take the whole definition where it is set forth in the

12  specification.

13      The example Mr. O'Neill cites is conditional

14  processing and looping.  He cites these as a reason why the

15  defendants' constructions are incorrect.  He argues that the

16  requirement that the rules be executed from top to bottom

17  would exclude one of the disclosed embodiments.  What Mr.

18  O'Neill fails to state, though, is that there is only one

19  disclosed embodiment in the specification.  The specification

20  doesn't give alternate embodiments or different ways to do

21  it.  It only describes the one way.

22      The other interesting thing to note is that the

23  description of this conditional processing and looping follows

24  immediately after the definitional language which the

25  defendants quoted in their definition.  So the specification,

1   the patentees themselves show no inconsistency, and we submit

2   there is none.  Conditional processing and looping are just

3   simple forms of flow control, very common and understood in

4   the art.  It is a simple way of doing flow control when you

5   have got sequential execution; i.e., top-to-bottom execution.

6   There simply is no inconsistency.

7         JuxtaComm, as I said, seeks to exclude most of the

8   definition, most of the cited definition from its proposed

9   construction.  It cites no legal or factual basis for doing

10  this.  What is interesting is that when looking at other claim

11  terms, for example "data bags," JuxtaComm does adopt a

12  definition and agrees to a definition that relies on multiple

13  sentences taken from the specification.  In the case of "data

14  bags," that is set forth at Column 4, Lines 12 to 21.

15        Likewise, dictionaries cited by the defendants,

16  these are cited for other terms like "interpreted" and

17  "scripts."  There are numerous examples in those dictionaries

18  of definitions that use multiple sentences to define a term.

19  There simply is no logical reason to limit the definition of

20  "rules" in this case to one sentence taken out of context.

21        THE COURT:  Okay.  Thank you.

22        What is the next term?

23        MR. O'NEILL:  The next one is "rule set processor,"

24  Your Honor.

25        MR. PENSABENE:  I am sorry, do you want to do "data

1    transformation rule sets" since it is kind of related?

2              MR. O'NEILL:  I've got "rule set processor" next.

3              MR. PENSABENE:  That's fine.

4              THE COURT:  All right.  We will let defendant go

5    first on this one.

6              MR. PENSABENE:  Your Honor, for "rule set

7    processor," the dispute centers around whether or not the

8    "rule set processor" is a separate component invoked by the

9    script processor.  The defendants submit that our

10   construction, which sets forth that requirement, is clearly

11   supported by the specification consistent with the figures,

12   the specification, and the inventor's testimony; whereas, the

13   definition offered by the plaintiffs has no real meaning.

14             Looking first to the specification, we see that

15   Figure 2 clearly shows the "rule set processor" as a separate

16   component that is invoked by the script processor.  You will

17   see there is a one-way arrow pointing from the script

18   processor to the "rule set processor" indicating the

19   invocation of the rule processor.

20             Likewise, the specification specifically describes

21   the rule processor as being "invoked by the script processor."

22   This responsive terminology is not used in the specification.

23   It is not explained what it means.  And "invoked" actually

24   adds meat to that definition and explains what it means.

25             THE COURT:  Aren't you really then arguing over

1   what "responsive" means as opposed to what "software that

2   processes a rule set" means?

3          MR. PENSABENE:  That may be one way to look at it,

4   Your Honor.  Your Honor is absolutely correct.  So maybe the

5   problem is what we are defining.  In that case maybe we need

6   to define what it means to be a "rule set processor responsive

7   to a script processor," in which case, again, we would argue

8   that it means to be "invoked by."

9          THE COURT:  And you were saying that "responsive" is

10  synonymous with "invoked"?

11         MR. PENSABENE:  That's correct, Your Honor.

12         THE COURT:  Okay.  Response?

13         MR. O'NEILL:  Your Honor, I think the issue does

14  revolve around the word "invoked."  That is where the briefing

15  is centered on at least.  Our position is a fairly simple one.

16  The claims says responsive to.  That sets forth the claim

17  relationship.  There is no need and no reason to replace that

18  word with the word "invoked."  In fact, there is a clear

19  reason, a legal reason not to.  That reason is that --

20         Holly, could we have the next slide.

21         "Invoked" is used in Dependent Claim 9.  And, as the

22  Court is aware, when you have a limitation in a dependent

23  claim, it sets up a presumption that it is not to be read --

24  that the independent claim is broader, and without a good

25  reason you should not take dependent claim limitations and put

1    them up into the independent claim.

2          THE COURT:  What is your response to the claim

3    differentiation argument?

4          MR. PENSABENE:  Our response to that is fairly

5    simple.  Claim 9 does not describe a different relationship

6    between the script processor and the rule set processor.

7    Again, our position isn't that "invoked" is being used here

8    synonymously with "responsive to"; rather, our position is

9    that Claim 9 be -- limitation added by Claim 9 is toward the

10   end of that claim where it says that the transformation is

11   based on predefined data transformation rules, the

12   "predefined" being the difference from the independent claim.

13         THE COURT:  Okay.  Final word.

14         MR. O'NEILL:  Your Honor, if the defendants contend

15   that "invoked" is somehow narrower than "responsive to," and I

16   assume they do because they have asked you to replace the word

17   "responsive" with "invoked" in Claim 1, then it logically

18   follows that Claim 9 is somewhat narrower, and the doctrine of

19   claim differentiation should take care of this.

20         THE COURT:  All right.  What is the next term?

21         MR. O'NEILL:  I've got "data transformation rule

22   sets."

23         THE COURT:  All right.

24         MR. O'NEILL:  Your Honor, here are the competing

25   constructions for "data transformation rule sets."  It seems

1    really to turn on whether or not we ought to say these rule

2    sets are transforming data or transforming data bags seems to

3    me to be the key distinction there.  We think that you should

4    not replace the word "data" with "data bags."  We think the

5    claim language is unambiguous, and we also think that the

6    specification supports a construction that "rule sets" are

7    collections of rules for transforming data, not data bags.

8            The claim language is the place to start.  "Data

9    transformation rule set," Your Honor, is almost

10    self-explanatory and self-definitional.  These are rule sets

11    for transforming data.  The preamble of the claim says this is

12    a system for transforming data.  So if we look at the claim

13    language, it is clear.

14            Now, interestingly enough, the claim does talk about

15    doing something with data bags.  The claim uses the word

16    "manipulating" not transforming, so to be consummate with the

17    plain language of the claim, the rule sets are transforming

18    data, not data bags.  In the specification we see the same

19    theme, here the title and the abstract, it is a system for

20    transforming data.  In the abstract, data is transformed

21    within the system using rule sets that act upon data bags.

22            And you will see in a couple of these passages they

23    talk about data bags being treated, perhaps, somewhat

24    differently than the data.  The rule sets transform the data.

25    The data bags are manipulated or they are "populated," using

1   terminology like that.  The word "populate" is at the very

2   last line of the second excerpt there, Your Honor, Column 6,

3   Line 32.  So the specification is perfectly consistent with a

4   construction that says "data transformation rule sets

5   transform rules."

6           THE COURT:  Response?

7           MR. PENSABENE:  Your Honor, looking to the

8   specification again, this is another term that is clearly

9   defined in the specification.  We know it is defined because

10  it uses the key words.  It says "rule sets" are collections of

11  rules within the present invention.  "Rule sets" are used to

12  transform a data bag in one format into another data bag of

13  different format.  These are words that case law, the

14  Sinorgchem case in particular, has recognized indicate a clear

15  intention to define the term.

16          JuxtaComm runs away from the definition, claims the

17  term is not defined in the specification and instead asks that

18  the term "data transformation rule sets" be defined in the

19  abstract.  They prefer you ignore the specification, look at

20  those terms, and just construe it based on that.  By

21  comparison, the defendants' construction mirrors exactly what

22  is contained in the definition from the specification using

23  the exact same language, again, just shortened up a little bit

24  for the purpose of readability.

25          THE COURT:  Next term.

```
 1          MR. O'NEILL:  I believe we are on to the last one,
 2   Your Honor, which is "systems interface."
 3          THE COURT:  All right.
 4          MR. O'NEILL:  Okay.  Here we are.  "Systems
 5   interface," Your Honor, we say it is "an interface to the
 6   distribution system."  They say "it is a component that
 7   enables a user to interact with the system."  We believe,
 8   number one, no construction is necessary.  Number two,
 9   defendants' construction, again, violates the principle of
10   claim differentiation, which is a presumption; and they have
11   done nothing to overcome the presumption.
12          Why is no construction required?  Your Honor, it is
13   a "systems interface" that is an interface to this system.  We
14   don't think the jury or anyone else needs any further
15   instruction on that, and the Federal Circuit in Phillips says,
16   hey, sometimes claim language is plain, and even ordinary
17   people can understand it.  We think that is the case here.
18          Moreover, the specification talks about a number of
19   different interfaces to this system so that it is improper to
20   limit this "systems interface" to any particular interface,
21   such as the user interface they want to drop in the claim.  I
22   have highlighted for you an excerpt from the specification
23   that says, "For example, the script processor can be initiated
24   either from the graphical interface" -- that is the user
25   interface, Your Honor -- "or from an interface external to the
```

1   system."  There can be other interfaces to the system.  That

2   is what the specification says.

3        We think Claim 1 is broad enough to encompass other

4   interfaces without specifying.  It is just an interface to the

5   system.  In fact, Claim 2 is the claim that adds further

6   details or limitations to this systems interface.  Claim 2

7   says, "wherein said systems interface comprises a

8   configuration management user interface."  That is the user

9   interface that the defendants want to put into the

10   construction of "systems interface."  So, once again, claim

11   differentiation.

12        THE COURT:  Response?

13        MR. PENSABENE:  Your Honor, Mr. O'Neill points out

14   that the debate here, I think, centers around whether or not

15   the "systems interface" in the claim terms is a user

16   interface.  The defendants' proposed construction reflects the

17   fact that it should be a user interface based on the

18   specification.

19        THE COURT:  How do you get around the Claim 2 claim

20   differentiation?

21        MR. PENSABENE:  Claim 2 does not recite any user

22   interface in the abstract.  Rather, it recites a configuration

23   management user interface.  Configuration management user

24   interface is a very specific type of user interface that does

25   things beyond just providing the ability of a user to interact

1    with the system.  For example, in the text that Mr. O'Neill

2    put up on the screen before, you see that the configuration

3    management user interface can be used to invoke the script,

4    start the script.  That is not something in Claim 1, and that

5    is something -- a more specific limitation than just a regular

6    "user interface."

7         THE COURT:  Go ahead.

8         MR. PENSABENE:  Turning to the specification then,

9    it is the defendants' view that the term "systems interface"

10   needs to be interpreted in light of the specification.  The

11   law is very clear on that.  We start there by noting that that

12   "systems interface" is not used -- that term, as it appears in

13   the claim, is not used anywhere in the specification.  What

14   the claims say is that this "systems interface" is used for

15   defining certain things.  It is used to defining the logical

16   import and export data interfaces, the data transformation

17   rule sets, and the scripts.  The specification, as you read

18   on, expressly states that all of these functions are performed

19   by a user.

20        On this next slide I have got some examples from the

21   specification where it describes that all of these

22   functions -- these functions that the claim says are performed

23   by the "systems interface," the specification describes all of

24   them as being performed by a user interface.  So, for example,

25   the first quote taken from Column 2 of the patent states, "It

1  is another object of the present invention to provide a means

2  of configuration management that allows a user of the system

3  to define scripts, import data connections, export data

4  connections, data bags, and the rule set definitions."

5  So here it is an object of the invention to allow a

6  user to provide these definitions.  Likewise, I won't read

7  these for the sake of time, but the other statements from the

8  specification are all consistent with this; that a user is the

9  one that provides these definitions.

10  THE COURT:  Anything further?

11  MR. O'NEILL:  It is an object of the invention to

12  supply that user interface, Judge and that object is achieved

13  by Claim 2.  We have given you the cases in our brief where

14  the Federal Circuit says not all of the claims have to achieve

15  all of the objects.  This object is in Claim 2.  It is simple.

16  THE COURT:  All right.  Thank you.  Does that

17  complete all of our claim terms?

18  MR. O'NEILL:  It does.

19  THE COURT:  Thank you both for excellent arguments.

20  Let me inquire, when are you set for trial?

21  MR. MACON:  November 9th.

22  THE COURT:  November 9th.  I am getting a little

23  behind.  It may be six weeks or two months before I can get a

24  formal opinion out.  Let me ask you if it would be helpful to

25  the parties for me to get out a preliminary ruling that would

1    not include the full-blown opinion but give you some guidance

2    in working with your experts --

3              MR. MACON:  Your Honor, it would.

4              MS. HUNSAKER:  Yes, Your Honor.

5              THE COURT:  We will try to do that in the next few

6    days then and allow you to move forward.

7              Who is your mediator in this case?

8              MR. MACON:  Jim Knowles is our mediator.

9              THE COURT:  Have y'all had a mediation?

10             MR. MACON:  We had a mediation.  We were successful

11   with a number of the defendants.  There are still several

12   others who we are still in discussions with.

13             THE COURT:  All right.

14             MS. HUNSAKER:  Your Honor, if I could ask the Court

15   the best way to submit the edits to the proposed construction

16   of the "utilizing" term?  Would it be best to file --

17             THE COURT:  I think I have got those down.

18             MS. HUNSAKER:  You have got it.  Thank you very

19   much.

20             THE COURT:  As far as mediation, defendants have any

21   comment on that?  Would another session be helpful, or are

22   y'all talking with the mediator, both sides?

23             MR. PENSABENE:  Your Honor, according to the

24   scheduling order, there is a deadline for a second mediation.

25   The deadline for that is triggered by the decision on claim

1  construction, so I think it would helpful to have

2  clarification as to when that deadline would be, relevant to

3  the intermediate opinion or the formal opinion that the

4  Court --

5          THE COURT:  I would think that you could go ahead

6  and mediate after the preliminary opinion, which you should

7  have, if not by the end of this week by the first part of next

8  week.

9          MR. MACON:  We will be agreeable to that.

10         THE COURT:  Y'all go back, visit with Mr. Knowles,

11  see if you can work out a business solution to your problem.

12  If not, we will see you in November.

13         MR. MACON:  Thank you very much, Your Honor.

14         MR. O'NEILL:  Thank you, Your Honor.

15      (End of proceedings.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7

8    /s/ Shea Sloan

9    SHEA SLOAN, CSR, RPR
     OFFICIAL COURT REPORTER
10   STATE OF TEXAS NO. 3081

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25